Good morning, Your Honors. My name is Matt Campbell from the Federal Defenders of Eastern Washington and Idaho. I represent Mr. Villacana-Ochoa, and I'm going to attempt to reserve approximately two minutes. This case presents a perfect storm of confrontation clause hearsay and Miranda violations. The government was allowed to introduce several hearsay documents without any opportunity for confrontation. These documents, including a CNR and a Miranda violative statement allegedly given by Mr. Villacana-Ochoa, provided the heart and soul of the government's case. The government conceded that without the documents it couldn't prove its case, and ultimately upholding the verdict, the district court relied on these documents as corroborating one another. Mr. Villacana-Ochoa was never given the opportunity to cross-examine the authors of these documents. The government never called him to testify. Instead, the government called several witnesses with no personal knowledge of this case. The witnesses could read, and they read the documents which had been cherry-picked from his A-file. They couldn't authenticate them from personal knowledge. Agent Hawkinson had no idea who the person was that allegedly took Mr. Villacana-Ochoa's statement. Mr. Brown never named the person who generated the CNR. The true witnesses in the case were faceless, and one was nameless, but they were certainly voiceless. If this verdict is affirmed, there is no real reason for the government to call any witnesses in a 1326 case. All they'll have to do is present an A-file to the jury and argue what it proves. And our position is that the Constitution, in cases such as Crawford, Melendez-Diaz, and this Court's precedent demand more. Turning to the CNR issue first, this Court and U.S. v. Orozco Acosta said that it was error to admit a CNR. It was clearly testimonial under Melendez-Diaz, and that Court found it to be error. We don't believe that's disputed in this case. It appears that the government is trying to say that Mr. Brown's testimony satisfied confrontation. That is inaccurate. The District Court clearly stated that Mr. Brown did not do the search, that a staff member under his supervision did the search, and that Mr. Brown signed off on it. I point to excerpts page 38 at line 5 in footnote 3, as well as excerpts at 150 lines 11 to 13. And if you look at the CNR itself, which is at supplemental excerpts at 5, it clearly states that somebody did the search and he signed off on it. Yeah, and you got to cross-examine him on that too, right? Your Honor, he was presented for cross-examination, but he wasn't the witness. Well, I understand what you're saying. He was the affiant of the CNR. He was the supervisor, right, of the agency staff member that completed the staff. He was familiar with the search techniques that were used, and he personally certified the conclusion that no record existed based on the search, and you were able to cross-examine him. So those are our facts, right? Am I wrong on that? Your Honor, I would concede that he was subject to cross-examination and that he was the affiant. He had no personal knowledge. He was simply essentially telling us what somebody told him. I believe under Melendez-Diaz and under Crawford. Did he testify he was familiar with the search techniques used? He testified that he was familiar in general with search techniques, but he had no personal knowledge of the search techniques that were used on this occasion. Everything I said was true, even though you say that there's other things, right? What did I say that wasn't true? He's the affiant on the CNR. He was supervisor of the agency staff member that completed the search. He was familiar with the search techniques used, and he personally certified the conclusion that no record existed based on the search, and you were able to cross-examine him. What is not true about what I said? That he was familiar with the search techniques used. He had no idea what search techniques were actually used on that since he didn't do it. He wasn't personally familiar with that search. Was he personally familiar with doing searches? Did he testify to that? As a general matter, yes. Okay. I'm more interested in maybe if I don't want to hijack this, but I'm more interested in the Miranda issue. Certainly. Now, Salgado established that biographical questions are not enough to trigger an alien's Miranda rights, and here we have a situation where clearly these particular statements weren't, he wasn't prosecuted on that charge. It just comes up later. So how long does someone get a pass? I mean, you know, obviously the fact that, you know, I think it's the fact that he wasn't prosecuted in criminal court based on that interrogation supports the fact that the officer wasn't intending to use it for a criminal at that point. But then it comes down, you know, down the line. So what do we do with that? Your Honor, in looking at all of the cases and trying to synthesize them, it appears that the standard for whether or not it's an interrogation is whether it's, there's a reasonable likelihood of eliciting incriminating statements. I think I would disagree with the government's position. It seems to be that there's a reasonable likelihood that criminal cases will, that a criminal case will rise or does rise. And Salgado, Chen, they both speak to that, and they talk about what's the likelihood of incriminating statements. Here it's clear if one looks at the alleged statement that there was a reasonable likelihood of incriminating responses. Well, so would your remedy to this be say, okay, these go beyond biographical, and so they should have given Miranda, but now, and they didn't charge him here, but then eventually in reentry cases, more often than not, they just keep coming and coming and coming. So let's just say they should have given Miranda here. Then the proper use of this would have been it could be used to impeach your client but not make a case in chief. Is that right? I hadn't thought about impeachment purposes, but presumably that would be correct. Oh, isn't that the law? Yeah. That would presumably be correct, that he could be impeached if he took the stand in a subsequent case. But you just couldn't use it to necessarily create the case in chief. Yes, that would be our position. The question I have, though, is even, you know, this seems to fall, to my mind, closer to the second category where it, you know, hinges into the criminal side. But even if that were the case, why isn't it harmless error here? Your Honor, we don't believe it's harmless error because, essentially, our position is that the two strongest pieces of evidence were the CNR and his statement. The government conceded that it couldn't prove its case without his statement. They said that, I believe it's ER-64, that they needed this. Is that when they were arguing to get it in, right? Correct. But they quite candidly stated they needed it. Let's look at what the district court. The district court said that the two corroborated each other, and in its order on reconsideration relied on the two statements, relied on these two pieces of information. Right. They had virtually no other evidence of numerous of the factors, including that he voluntarily entered, which was one element, that he knew he was in the United States illegally, that was another element, that he entered without the consent of the Attorney General or Homeland Security Secretary, a third element, and that he was an alien at the time of reentry. So out of the five elements, the only one that they had was arguably was deportation. Well, can't the jury, I mean, if you're found somewhere, you're not like somewhere at the border at the Peace Arch and you're well within the United States and you're there without any particular duress or any indicia that there's any problem, can't the jury take a look at those facts and say, well, that's sufficient? It's kind of like if you have the crime on video, how much of a difference does the statement make? Your Honor, certainly he was found within the country. I would concede that point. We know he was an alien from the CNR, and I know you have an issue with that, but we know that or the jury would know that, right? Yes. If we assume that the CNR comes in. Yeah, I'm just assuming for talking purposes here. If we assume that the CNR comes in, then yes, they would have evidence that he hadn't reapplied. Okay, and he's well within the state of Washington, which that's a fact that the jury can take notice of because somebody's going to testify where they found him, right? Correct. Somebody else. Correct. The jury could certainly make some inferences, but again, our position is that none of it should have come in. But the statement was conclusive as to numerous different elements. This was not, and I just want to add and then reserve the remainder of my time, that if one actually looks at the statement, it's clear the statement was taken after the government was, the agent was aware of his entire record. So we would distinguish from Salgado in cases like that. If you look at one of the questions, he answers that he had been arrested numerous times, that all the information on the computer is correct. So he had given his, they told him they knew what his record was. This is not a situation where they just asked him, hey, could you be an alien? They knew that he had been deported numerous times and that he had committed crimes. I'll reserve what little time I have left. Okay. May it please the court. My name is Bill Childress with the United States Attorney's Office in the Eastern District of Washington. The United States believes there are three issues before the court today. One, the defendant's sworn statement was properly admitted because Miranda warnings are not required in a civil deportation proceeding.   Yes. And they're not required in a civil deportation proceeding. Okay. But the question is, later you used them in a criminal proceeding. Yes, Your Honor. So they seem to be more than just, they seem to go beyond Salgado. Your Honor, in this case, the facts of this case also go beyond Salgado. This defendant had attempted to enter Canada, was denied entry at the Canadian border, turned around at the time the statements were taken. Oh, it's a great statement. It's a great statement. And the best argument that you have, to me the argument that you have, is because the officer wasn't intending to proceed criminally, and they didn't proceed criminally on that, is that enough to trump all the rest of it? Yes, Your Honor. Well, I don't know any case that says that exactly. We would be the first one to say that. Your Honor, respectfully, the additional facts in this case support that contention. So when the defendant presents himself at the international border, he's asked a series of questions to determine whether to allow him into the United States. And these questions are not asked in a criminal context. He's not charged with a crime because of the totality of the circumstances in that situation at the border, at an international border. These are reasonable questions to ask to determine, is this individual presenting himself for entry into the United States, after he's been denied entry into Canada, is this someone that we should allow into our country? And so the determination was made. That may be fine for purposes of deciding whether or not to let him into the country. And to use for the civil proceedings. And to use for the civil proceedings. The question is, can you then, without Miranda warnings, without telling him that these can be used against you in a criminal proceeding, without telling him that you may be arrested or that he's subject to arrest, you then use them in a criminal proceeding? Yes. And how do we know that? Your Honor, Salgado tells us that, as in Salgado, the response became incriminating only after the defendant had been deported, had illegally reentered the country, and had been arrested on state charges unrelated to his immigration status. That's language from Salgado. And those are the facts in this case as well. But you know, I mean, anyone that works in this area or any of just read these cases, people don't just come once. They come often and, you know, just a lot. So you can – if you don't get them one time, you're going to get them another time. I mean, it's practically – so why not just say, hey, if you want to go beyond that, Mirandize them because they're going to – there's a strong – you may not choose to prosecute them here, but there's a strong likelihood they're going to in the future. You can still use this for impeachment, but you just can't use it to make your case in chief the next time. Your Honor, the – this – because this Court has decided in Solano-Godin's and in Salgado that this – that these statements are admissible in a criminal – in a subsequent criminal case, and in Salgado, the Court referring to the agent who asked the questions of the defendant in that case, we don't presume that this agent is naive. We don't presume that the agent is naive, and it's never occurred to someone with a practical experience or without much experience that someone who's been deported is quite possibly or likely to reenter the United States. Well, the real question is proximity and linkage. So you have Chan where they, like, right away prosecute the guy. And then you've got Salgado where you have eons of time. So the real question, though, is if the person knows based on the nature as the questioning develops that this looks like, you know, a reentry or a potential criminal prosecution, whether they at that point should stop and whether this case rises to that level. It's a question of proximity and knowledge, so timing and knowledge. So what is the government's response to that? The United States' response to that is that the facts in this case don't rise to that level, in part because under the circumstances at the international border, this is a series of questions, and the subsequent questions depended on the defendant's answers as well. It's not just that the officer who's asking this. Well, okay, do you concede if you had immediately prosecuted Villicana Ochoa, they would have been, you would have had to mirandarize them? Your Honor, under those circumstances, yes. Okay, so it's just not neat. You've got the cases where if you ask questions like this and you prosecute them right after, you can't use it. Then you've got the questions that are much less probing than the ones that are asked in this case, and you can use them. And so here what we have is probing questions used way later. Your Honor, what we also have in this case, in the cases where this Court has found that mirandar warnings should have been given, either you have Chen, where the defendant was questioned in the context of an ongoing broader criminal investigation. There's testimony before the grand jury that the prosecutor was going to, basically was going to lean on Mr. Chen to get testimony about Mr. Lee. Then you have Mata Abundez. In that case, the defendant was in custody on state, on charges, a state crime of being an illegal alien in possession of a firearm. And in Gonzales-Sandoval, the defendant had been arrested on suspicion of being an alien after deportation. The common thread in those cases is that the suspicion that the Court's referring to is not the suspicion that comes with experience. It's the suspicion that comes from formal proceedings, that they're an element of the crime the defendant was suspected of. The immigration status was an element of the crime the defendant was suspected of. In this case, the defendant was not suspected of a crime. It was simply to determine, these questions were to determine, whether to allow him into the United States. If we take it as truthful, he seems like a poor, hapless guy who drove north instead of south on I-5 and ended up in the wrong, ended up at the border instead of further south. So, at what point, though, at what point, why do you need these questions? Suppose you lose. We disagree with you on the first point. How else have you made the case? Your Honor, as the District Court found this evidence was cumulative. So, would you just tick it off? We would defer to the District Court's findings and refer to our brief on that. But the essence of the position would be that without the sworn statement, that there's still Mr. Brown's testimony itself. It's harmless error is what you're saying? Yes, Your Honor. Thank you. I do understand that. I wanted you to just explain how every element was made otherwise. Your Honor, the defendant was in the 1326 case, then the United States bears the burden to prove that the defendant was in the country illegally. The certificate of nonexistence of record, the certificate itself, also Mr. Brown's testimony independently corroborates the document of the CNR. So, the United States can meet that element through Mr. Brown's testimony. Agent Hawkinson testified that he had reviewed the A file. The warrant of deportation and the notice to the defendant demonstrate that the defendant had been removed from the country. And so, you have that the defendant was an alien as evidenced by the CNR. Did he testify? No, Your Honor. Okay, so you couldn't have impeached him, though. No, Your Honor. But this evidence, it's harmless error because And the fact that he was found in the United States was where he was found was testified to by Yes, Your Honor. Agent Hawkinson testified to that. Agent Cornell also testified to that. Agent Cornell was the one who took the defendant's fingerprints in Chelan. Your Honors, my time is running short. I would conclude by saying that on the issue of the certificate of non-existence that the United States presented the witness against the defendant. That satisfies the confrontation clause. Thank you, Your Honors. Thank you. Thank you, Your Honors. Just to wrap up very quickly, all the cases cited speak to the likelihood of incriminating statements, not to the likelihood of a criminal case. We don't believe the government can determine that it's a criminal case or that it becomes an incriminating statement just by filing charges. And we just wish to point out, since we don't have time, that the statement we believe is also inadmissible under Crawford confrontation and hearsay since the person who allegedly took it never testified in court. So there's no way to authenticate the statement as even being his. Okay. Thank you.
judges: Schroeder, McKeown, Callahan